May it please the court. My name is Chris Landau and I represent the appellant W.R. Grace. I'd like to reserve five minutes for rebuttal. Mr. Landau, before you get started on your principle argument, I'd like you to tell us about the status of the bankruptcy. Now, there's a statement in your brief that if we were to require you to pay the government, then there would not be funds to pay the people who have claims in for asbestosis or whatever else. Your Honor, I don't think we said just to be clear that there would necessarily not be funds. What would happen is the United States would become a judgment creditor in the bankruptcy and would then be in the pool of unsecured creditors. And depending on what the plan ultimately provides for people in that pool, it is entirely possible that everybody winds up getting, you know, X cents on the dollar. Share of the fund. Precisely, Your Honor. Well, then the next question is ordinarily there's a stay. Was this case released from the stay so it could go forward? Yes, Your Honor. The United States filed a motion after the bankruptcy for a declaration that the automatic stay did not apply pursuant to I think it was section 362B-4 of the bankruptcy code. And the district ruled that, in fact, the action should not be stayed in the actual case. Well, I don't know of any legal principle which would tell us that we should back off if, in fact, we were to determine that those funds should be paid. Kind of a sob story that these other people might be disadvantaged. Your Honor, really that was an informational footnote. I don't think we were making a legal point there as much as pointing out the consequences of this. And, you know, I think that that's something that the Court might want to understand in terms of the larger picture of what's going on here. Well, I think it's irrelevant. Okay. Your Honor, again, I think the key picture here to go to what is what we believe is the core point is that this is an appeal from the grant of summary judgment in the EPA's favor in a CERCLA cost recovery action. Well, no, you had summary judgment, I thought, on the things to which you pretty much agreed, and then there was a bench trial as to the rest. Are you not appealing the bench trial determinations? No, Your Honor. One of the things that we are appealing is the award of indirect costs. That's something that comes out of the bench trial. The really the main focus of the appeal, though, that the first two issues of the three issues that we've presented arise from the grant of summary judgment, and that's the district court's determination as a matter of law that the United States is entitled to summary judgment on its compliance with the statute and the regulations implementing the statute. Let's explore where that takes us procedurally. If we were to determine on either the removal versus remedy or the emergency point that the district court was incorrect, is it your position that we make a determination as a matter of law from the record? Or does this go back for a trial, and if so, on what standard? Your Honor, I think that you can safely say on this record, because the United States has come in and tried to say that the costs of the Libby response action in gross are an emergency removal action. We think that that is incorrect as a matter of law because they never made any attempt to disaggregate that, explain any particular costs. They came in and really said, please, court, award us every penny, whether it's spent on removing a particular, digging up the ground in a particular case or putting new rocks along the riverfront or buying a popcorn machine for the school, every single penny. They said that's all part of the emergency. So we think that that is incorrect as a matter of law. But step back. The first decision we have to make is whether or not the district court was correct in determining that the designation of this as a removal action versus a remedial action. Do you agree that's the first step? Yes, Your Honor. In a sense, that and the emergency step kind of go together in the sense that the government has to prove that this is an emergency removal action. We broke it down for kind of convenience sake conceptually into those two steps in the brief. But at the end of the day, they've come into court saying these are the costs incurred in an emergency removal action, and please bless these costs. As we said in our briefs, we believe that it doesn't meet either the removal criterion or certainly not the emergency. Let me go to the emergency. This was a little perplexing because I guess I imagined that that might be defined somewhere. But am I correct that emergency is not defined vis-à-vis removal in the CERCLA statute? Well, Your Honor, the CERCLA statute limits the government. When it goes through a removal, it limits the government to $2 million for 12 months unless one of the exceptions applies, which are set forth in the statute. And in the first two action memos, the government relied only on the emergency exception to bust the cap. So my question is a really simple one, and that is, looking at 9601, et cetera, particularly Section 23 of 9601, where it talks about removal, it talks about emergency, and then there's also the exceptions. Is emergency defined vis-à-vis removal in the statute? No, Your Honor. There's no specific definition. The only ñ in the statute. In the statute. Okay. I just wanted to clarify that. So then ñ It's not one of the ones listed among the definitions, Your Honor. So then I went to the one thing that was listed, the Disaster Relief Act and Emergency Assistance Act, to see if that might be illuminating. And it wasn't a lot more illuminating, but it talked ñ it did define emergency, and that is listed under 9601. So that's one place I found emergency. The other place emergency is found is, I believe, in the proposed regs of the EPA having to do with oil spills. But that's not really in this section. Your Honor, I would also refer you to 53 Fed Reg 51394, which is ñ That's what I'm looking at. Those are proposed rules of the EPA for national oil and hazardous substance pollution. Right. And in page 51409, the agency says as follows, Emergencies generally refer to those actions where the release requires that response activities begin on site within hours of the lead agency's determination that a removal action is appropriate. And the Second Circuit, as we pointed out in our briefs, picked up on that language in the Potter case, where they said that the removal of anthrax from a New York postal facility did not qualify as an emergency. What I wondered in that point are two things. One, this was listed as proposed rules, and have those ever become final? And second, it's the fact that it was listed in connection with an oil spill, something specific as to how you might define an emergency there in an oil spill situation than you might define it in a non-oil spill situation. Your Honor, with respect to your first part of your question, I believe that this became final. I'm certainly not aware of anything. And the EPA didn't say in response, in its brief in response that ñ I guess we'll ask them. Right. But in terms of the oil spill, I don't see this language here that you're referring to that we're both talking about as being limited to oil spills. And it seems to me this is just a very natural definition of the word emergency as one would understand it colloquially. Again, I think our fundamental point here is that we believe that it is impossible as a matter of law to put every single thing that the EPA has done in Libby into the category of an emergency response. And the EPA, in a sense, doesn't even ñ I don't read their brief to seriously contest that. I think what they insist on doing is saying, well, there was some emergency, and then somehow suggesting that that's an open sesame once they declare an emergency to spend money on an unlimited basis. So are you saying that even if they're correct on removal and emergency, that the costs would need to be disaggregated as to what was a real emergency and what was not? I think that's right. I think that's the only way the statute makes sense, that you can't say, okay, there's an emergency in this room, and that's entitling us to be putting rocks on the river and buying a new scoreboard system for the high school. Again, I think the emergency, how ñ again, if you look at section 9604c1a, it says it's got to be a continued response to actions that are immediately required to prevent, limit, or mitigate an emergency. So I think the statute itself tells you that the relevant actions ñ it's just not a question of saying there's an emergency in the abstract and then spending money at will. I think the actions that are sought to be justified under the emergency exception have to be actions that are taken to prevent, limit, or mitigate the relevant emergency. Is it your position, counsel, that the EPA could have taken other actions, perhaps cheaper actions, perhaps slower-performing actions, to mitigate the damage ñ mitigate the danger out there? Yes, Your Honor. I mean, I think ñ and some of the ground in the baseball fields and the track and around. The EPA said that 2 percent asbestos would be entrained by the use of the facilities. We had to remove it right away because once the asbestos was in the air, it could be ingested ñ pardon me, inhaled ñ and cause a series of asbestos-related diseases. What proposal, A, do you think now and what proposal, I'll ask you in a moment, was made then to remediate that situation without having to remove all of the turf? Well, I think, Your Honor, you can consider a variety of options. And just to kind of walk through that, in the first place, we actually questioned some of their scientific findings. And that's one of the things we would have liked to have proven if we'd had our day in court to question some of the numbers that they had. But even accepting that, Your Honor, we don't think that digging up, let's say, five feet of soil as opposed to maybe one foot of soil is necessary. Because we think that ñ again, we think that all of the asbestos that there was in these various places was within their own remedial guidelines, which is where you want to wind up after you do the remedy. But, you know, we think the way the statute is set out here, the basic dichotomy between removal actions and remedial actions, the remedial actions, you have certain procedural protections. You have input in the process. So if they're saying ñ Perhaps I wasn't clear. Is it your position that you offered then different alternatives to excavation of the asbestos-laid dirt to wit, paving it over? Yes, Your Honor. You did?  And that would have been much cheaper than ñ Yes, Your Honor. In fact, it's ironic because those running tracks, for instance, in the high school, had already been paved over. And the EPA actually ripped them up at that point. And, again, I think that the running tracks are a good example with respect to ñ Can you tell me that they didn't go out there and take fiber burden studies of the dirt underneath the pavement to see what fibers per cubic centimeter there were? Well, Your Honor, again, I think capping asbestos is usually a remedial action. It's the kind of thing that you do. And what they came in and said, well, some asbestos could always escape from under the tracks, which, again, may justify a long-term remedial scheme that would say let's just get the asbestos out from under there. But there was simply no emergency. And, again, you don't have to take our word for that. The EPA was specifically asked, or they specifically said with respect to the schools And I'm quoting from page 388 of the ER. There is no ñ EPA has concluded that there is not an immediate acute risk from asbestos at the track. And they were asked in a question and answer session with the townspeople in Libya. This is on page 1043, ER. Audience member questioned, is it okay to use the track for meets today? Answer, yes. So the EPA itself recognized that this was not an emergency, and they didn't treat it as an emergency. Again, buying a new popcorn machine is not an emergency response. Okay. Well, what I'm having trouble trying to get my hands around is there's no definition of emergency. So as a matter of law, we need to, I think, have a definition of emergency against which you benchmark the evidence. Did the district court actually define emergency? He did not, Your Honor. If you look at ñ this is one of the real problems in this case. In a sense, we're winding up talking about the evidence. But the problem is the district court, if you look at his legal analysis on page ER1082 and 1084, the district court just said they considered the factors. Therefore. And consideration was it for the district court. Okay. Now, let's just say we came up with a legal definition, whether from the dictionary or EPA's various documents, a legal definition of emergency. Would that be the end of our task and would it go back to the district court to determine whether the evidence meets the emergency standard? I think the answer is yes. We say as a matter of law that we think it's clear from what EPA has done here that it's not an emergency, that it wouldn't meet any definition of emergency. But certainly, you could, if you disagree with us on that, the statute provides kind of a ñ It seems to me you have conflicting evidence on that. So then my question is, if you went back to the district court, in these kind of circle actions, do you have ñ I'm not saying it's going there, but I'm just trying to understand what the process might be. Right. Would you have, in effect, a trial on disputed points on an emergency? Yes, Your Honor. Okay. I think ñ and that's ñ if you look at the versatile metals case, there was a bench trial on that issue. And that was what we thought we were gearing up for when the district court, at the last status hearing before trial, declared that he had decided to grant the United States motion for summary judgment. And so all this was out of the case. I mean, I think ñ So how then, if you have a bench trial in these things where there are disputed issues, how then is the court to give appropriate deference, or if not complete deference, some respect to the agency's determination? I think the Tenth Circuit in the Sunoco case said that, you know, these are legal characterizations of this as a ñ as a response versus remedial action ñ excuse me, as a removal versus remedial. I think certainly the emergency is a limitation on their discretion to spend money from the fund. At most, I think this would be entitled to some kind of skidmore deference, which is essentially the deference to which it's entitled because of its persuasive value. And, again, I think this is just so far beyond what the scheme ñ the two-pronged scheme really allows, that basically they've turned this all on its head. Now, if we were to agree with you and send this back for a trial, and they said, okay, it really wasn't an emergency, then do we have to go through a remedial study and recommendation as to whether they did the right thing or didn't do the right thing? Where are we going on this? Your Honor, I think, again, the statute section 113J has a provision, basically a harmless error provision, that I think allows them to try and prove now that certain things were properly classified as an emergency removal action. I don't think at this point they can come in and try and say this was a remedial action because the costs have been incurred. I mean, you get the procedural protections to participate in the formulation of the plan and to say, please, you know, you only need to dig up one foot in the forest versus 13 feet or whatever. That ship has sailed. I mean, they, for better or for worse, they have categorized this as an emergency removal action. So I think at most, going back to your question. At what point did Grace have some input into what was going on? Did they not? Your Honor, what Grace did is Grace made comments on the administrative records to always make it clear that we thought that they were engaging in overkill. But that certainly is not the kind of protection that the statute entitled us to, which is really to participate in the process in the RIFS, Remedial Investigation Feasibility Study. Because you only have a minute left, counsel, I do want to go to the indirect cost question. How did you or would you figure the indirect cost? You criticized what the Court did in allowing all the indirect costs, including the costs of subcontractors and contractors at the work. How would you do it? Well, Your Honor, certainly we think that the prior method is a better method, which keyed off of EPA's own time, which is a more valid proxy. But, again, it's not really our burden to come up with the ideal method. And certainly for them it's no response to say, well, the other, the old method was criticized, too. Our point is that using the total cost of the project is just not a valid proxy for divvying up the pie of EPA's indirect costs. I mean, EPA was ---- This reminds me of a tax case that the Ninth Circuit got reversed in where it basically made that argument that you can't use a proxy and the Supreme Court said no, that, you know, given deference to the agency and trying to figure out how you might come up with this, they can use a proxy if it's somewhere within a legitimate range. It seemed to me that this would just be our substituting our judgment for the agency here, wouldn't it? Well, Your Honor, I do think the difference from the tax code is that here the statute requires you to have a nexus to the action. They can only recover those costs associated with the Libby response action. And it's quite dramatic that the old method would have given you $1 million in indirect costs. The new method gives them $11 million in indirect costs. So we believe that it transgresses the statutory boundary, particularly given that a lot of those costs have already been passed through as direct costs because the agencies that incurred the costs already charged EPA their overhead, and EPA has already passed that on to us as direct costs. Let me ask one other question on this point of remedial versus removal. There's not a bright line in the statute. So in your view, what is the legal principle that would flow from what you ask us to do, which is a reversal of this as a removal action? Your Honor, I think we would encourage you to follow what the Eighth Circuit did in the Kalman-Abrams case and the Tenth given the permanence and the very great cost of the action, that this clearly, wherever you draw the line, in particular close cases, this is so far on one side of the line that it really cannot reasonably be characterized as a removal action. And if parts of it could be characterized as a removal action, then your solution to that is to desegregate the costs? Yes. If they want to come forward and say, you know, we spent this money on fencing. We spent $200,000. It seems to me that's what they're entitled to do on remand. If you remand it and they would, it seems to me, be entitled to come in and say, okay, again, it seems to me this flows from the section 9613 procedural error component that they should have an opportunity to try and defend certain particular items or any item that they want as a, you know, interim relatively inexpensive. Again, particularly, it seems to me the issue here is really the emergency. And again, I think as you noted in one of your earlier questions, there was disputed evidence on both sides. Are we talking about the fact that you think that they aren't entitled to these costs because they're an emergency, or are you objecting to the method? You're kind of mixing up those two arguments. Well, Your Honor, we think that they're not entitled to these costs because we don't think as a matter of law that these can be justified as emergency costs. Okay. We've got your point on that several times. Right. But now we're talking about what indirect costs that they can recover. The burdening of the costs. And so we're looking at what method is appropriate. Oh, so we're on the indirect costs. Yes, Your Honor. I mean, it seems to me on the indirect cost point, our basic point is that it's simply not reasonable by any means for EPA to allocate its own overhead based on the total cost of the project, at least in a case like this one where EPA has delegated the majority of that project to someone else. That that's not a valid proxy. Again, particularly where that other entity has already charged a lot of these costs through as indirect costs that they've charged EPA. In other words, you've got the Volpe Center, the Department of Transportation. They're charging overhead for their time to EPA, which is charging us that money as a direct cost. So in a sense, there's double counting here. Do they have any oversight responsibility for the whole project? Well, Your Honor, that's one of our points, is that they delegated that. In other words, the general contractor for the project was the Department of Transportation for most of these costs. And to the extent there was an EPA person who's working on this project, they can, of course, charge that as direct costs. We're talking here. I think we've got your point on that, and you've exceeded your time as a result of our questions. So I'm going to allow the government some additional time as well. Thank you, Your Honor. You'll have a short time on rebuttal. May it please the Court. My name is John Starr, representing the United States, and I will be addressing the removal issues, and Mr. Jim Freeman, who was trial counsel for the government, will address the indirect costs. Before I get to the legal issues, I just want to correct one of the factual statements made by counsel, which I think is indicative here. Counsel for Grace discussed the running tracks at the schools and quoted a statement from EPA saying there was basically no problem. If you look at that statement and the timing of it, it was very early. It was when EPA first got to that location. Once EPA actually examined it, it found that there was exposed asbestos at school running tracks, which were used every day for PE and other activities. And I think for all of the examples they give, you'll find it's the same situation. So how long after they discovered that was it before they shut down the school or the track? I don't know the exact timing of that, Your Honor, but they acted promptly there because there was exposed asbestos at the track and under the bleachers. Wasn't there a six-month delay? Didn't I read somewhere there was a six-month delay between your arriving at the track and taking action? There was a less than six-month planning period before EPA began removal actions. I don't know the timing specifically. But basically the track remained in use. I don't think that was the case, Your Honor. I can check on that. If you have a citation for that, you can provide it to us. The clerk has little pieces of paper to provide supplemental citations, and I would appreciate that. I'm assuming it remained in use as of the time of the statement they're quoting because EPA hadn't had a chance to examine it. Counsel. My point is that they're basically second-guessing all of these determinations at discrete locations. Well, of course they're second-guessing. They have 55 million reasons to second-guess it, right? That's correct, Your Honor. But my point is there's a very detailed administrative record. Let's talk about some of the details, because in a prior life I had some experience with asbestos cases. I'm taking a look. Let's see if we understand each other. The danger of asbestos to asbestos-related lung disease is through inhalation. That's correct. If asbestos is in the ground, if it's in the walls, if it's on the rocks, if it's in the stream, it doesn't pose a hazard of inhalation unless it's entrained in the air by use, right? That's correct. But whatever use is made of the area, the result is that there will or will not be fibers of asbestos in the air, right? That's correct. And we know since 1994, OSHA has said that for an eight-hour day, constant inhalation of asbestos, the PEL, the threshold limit that is acceptable, is one-tenth of a fiber per cubic centimeter, correct?  Now, attached to the report of the action memo number one, the attachment one table one, and I looked at the air sampling results for the screening plant. At the screening plant, the highest fiber per cubic centimeter value that I could find was not 0.1, but 0.00278, which, by my math, is 40 times lower than the PEL given by OSHA. At the export area, the highest value was 0.00340. That's an ER229, 30 times lower than the OSHA level. Do you consider those readings to pose an immediate emergency to the health of the people breathing? Not at the time those readings were taken, Your Honor. But let me point you to some other sampling results, which are in the memos of Dr. Weiss, who was EPA's senior toxicologist. I have Dr. Weiss's report here, May 17, 2000. Is that what you want me to look at? What Dr. Weiss found, and this was based on breathing zone samples, where the measuring equipment was right up around the respiratory area, Dr. Weiss found that samples exceeded EPA's risk range for cancer risk levels over a lifetime of 10 to the minus 4, ranging from 10 to the minus 4 to 10 to the minus 6. So they did take samples that showed that EPA's risk of concern was exceeded for breathing, for inhalation. The point at each of these locations, including the homes, driveways, yards, et cetera, and the screening plant and export plant, was that this stuff is easily stirred up just from everyday routine activities. Of course it can be easily stirred up, but the proof of the pudding is in the eating. The question is, were there fiber counts in the air, which indicated that this was a dangerous condition? The only ones I could find are the ones I've cited to you. Actual fiber counts, which is the way that most people involved in the asbestos business take a look at danger or not. If you look at Dr. Weiss's memos, and there's one in – Can you give me the citation? I'd be glad to. There's one in our supplemental excerpt, and there's one in the initial excerpts of record. I have one in the initial excerpt of record, which is ER 235 through 245. But in that, I do not find any fiber counts on cubic centimeters, which indicates a danger above that which the – Okay, Your Honor, if you look at page 29382 to 29383, and that's just – 29382. That's just the conclusion. Well, would you just once more give those citations, please? Yes. Our supplemental excerpts at 29382 to 29383. Now, those two pages are just the conclusion, and there's further information back in the memo. That's another Dr. Weiss report? That's Dr. Weiss, who's the senior toxicologist. He says – and this is from actual breathing zone sampling that – What's the date on that? The date of the memo is December 20, 2001. He says, While data are not yet sufficient to perform reliable human health risk evaluation for all sources and all types of disturbance, it is apparent that releases of fiber concentrations higher than OSHA standards may occur in some cases. May occur in some cases. May occur, mainly those associated with active disturbance of vermiculite, and that screening level estimates of lifetime excess cancer risk can exceed the upper bound risk range of 10 to the minus 4, usually used by EPA for residents. Was an actual fiber count taken? If you read back into the memo – The date on that, please? On page 29380 are screening level exposure parameters for residential worker exposures under different scenarios, and that screening level risk estimate begins on 29379. What's the date on that second memo? The second memo is – Is that a December – It was a little earlier than that. I believe it was – yes, July 9, 2001, and that's found at excerpts of record 825. Okay. That brings me to a question, then, about the timing, because we have three action memos here, and I think it's fair to say the first action memo kicked off the activity, and there it was determined to be time critical, and the EPA determined that there was an emergency. When we are looking at, if we were benchmarking whether there was an emergency or not, what's your view on how we evaluate the fact that there are three action memos coming at different times with different backup information? Yes, Your Honor. The first memo was for the screening plant and export plant, and in that memo, EPA indicated it was doing further sampling and that additional areas might be discovered. And, in fact, that's exactly what happened with respect to school properties and several residential properties. So that led to EPA's first amendment of the action memo. And then as EPA continued its sampling throughout Libya, it discovered all these additional hotspot sites in people's yards and driveways where there was a high exposure risk and significant migratory potential. Now, let me ask you about that. I understand, of course, everybody understands having lived through the asbestos era and the litigation. Did these individuals remain in their home until they got to them home by home? That's correct, Your Honor. Okay. So that's where I have to say I'm having a little logical trouble, because if there were an emergency, I would hope I would get kicked out of my house. And if there were an emergency of some immediate health risk, which would justify busting the cap, that's why they talk about screening or moving people out temporarily. I'm having a little trouble juxtaposing the word emergency with what actually happened, and I would appreciate your illumination on that. Okay. First on the relocation question, and then I'd like to address the term emergency. But as far as relocations, EPA did not do massive relocations. When EPA did the cleaning, of course, it did get people out of the house. For that invasive type of disturbance, it did remove people from their homes for the actual cleaning. Prior to getting to a particular house, they gave detailed guidance to the residents as to what to look for, what to do, what not to do, an extensive list of precautions that people should take. I think relocating that many people would have been very difficult logistically and financially. I suspect if EPA had done that. I agree. But if there was an emergency, a real emergency, it seems to me cost would be literally no object. That's why they let you lift the cap. But if there's not a real emergency, then you can give them instructions and then go through the various procedural setups that are appropriate in a remedial action, wouldn't you? First, I suspect Grace would disagree on the cost is no object. If EPA had relocated everybody, I'm sure Grace would be objecting to those costs as obsessive. But what EPA did here was give detailed guidance, got to each house as quickly as possible, moved people out for that. And EPA had to do some level of balancing here, and that was the way they approached this. And the immediate risk that you were concerned with was the inhalation of asbestos. That's correct, Your Honor. Asbestos-related lung disease, correct? That's correct. And the reason I parse that out is because there's some talk about ingestion of asbestos. Is it the claim of the EPA that drinking water with asbestos fibers can lead to stomach or intestinal cancer? I don't know the answer to that. But as far as ingestion, the main concern here was inhalation. That's absolutely correct. So we can forget about ingestion and just talk about inhalation. Yes. If the term ingestion was used in the record, I suspect it referred to kids playing in soil and just ending up putting a little in their mouth or something like that. But the main concern here is the inhalation. You said you would then turn to this issue we are wrestling with, and that's the definition. Can you provide us from the EPA standpoint some benchmark for determining as a legal matter what an emergency is? Yes, Your Honor. First of all, you were correct. There's no definition in the statute or the regulations. I think, though, its meaning can be determined by looking at the wording in context of Section 104C1A itself. There are two key words in that provision, immediate and emergency. And I think it's clear what immediate refers to is the timing of the threat, that is, how soon the public is or will be at risk, while the term emergency refers to the nature and magnitude of the threat. That is, the EPA will determine whether there's an emergency by assessing the nature and magnitude of the threat, by looking at concentrations, toxicity, exposure risks, and potential medical impacts. And here, of course, the record of medical impacts is extraordinary as to what has happened in Libya. Which statute are you looking at or which section? I'm looking at the exemptions to the statutory, the general statutory limits, Section 104. The exemption section. All right. Thank you. Section 104C1A. And that's what gives EPA the authority to apply the exemptions. But as I say, it talks about immediacy and urgency. Okay. Now let's, if we take that, now we have to figure out, you know, what does immediate mean? Is immediate six months, nine months, or is immediate within some short-term period? Yes, Your Honor. Grace refers to some preamble language which talks about starting on site within a few days. If you look at that preamble language, what it's talking about is kind of a classic emergency where you have a burning tanker car or something like that. But if you look at the remainder of that discussion, it's clear that that's not the only kind of emergency. In fact, if that were the only kind, there would almost be no point in having these exemptions for the $2 million, 12 months, because that kind of classic situation is usually cleared up fairly quickly. Counsel, the fiber of asbestos poses an immediate danger to the person ingesting it. I mean inhaling it.  Immediately. It goes right down his lungs and starts scarring right away. Right. That's correct, Your Honor. But not every presence of asbestos is an emergency, because if it doesn't violate the OSHA 0.1 fiber per cc standard, you can inhale asbestos. At least OSHA tells us. Well, that's true. If it's. It has to be something more than just immediate in the sense of causation of damage. Well, if it's in a. It has to be sufficient concentration to cause damage. Right? I think that's what EPA looks at when they're looking at the emergency. Well, sufficient concentration to cause damage. They look at the word emergency is the nature and extent of the threat, which involves looking at toxicity, exposure potential, all of those. So why wouldn't we. It seems the closest thing we have to a definition of emergency is one that was promulgated by EPA itself. Were those. Did those regs become final? They're final, but there is no definition of emergency with respect to the removal question. No, I understand that. But I'm just saying that that is a definition of emergency, at least in that context, promulgated by the EPA. And it's the only one we have short of a dictionary, correct? That's correct. Okay. That's why I'm looking, though, at the wording of the statute itself and this distinction between immediate and emergency. And I think that helps you get to what Congress was talking about in terms of emergency. In your memoranda, they talk in terms of time critical. Now, is that anywhere in the statute? No, it isn't, Your Honor. Time critical is not in the statute. That's something EPA has determined as one type of removal action, a time critical where EPA begins on site in less than six months. But that can be because of an emergency situation. It doesn't have to be the, you know, exploding tanker car. Now, if you had, if EPA had decided that this was essentially a remedial action, what additional hoops would they have jumped through before embarking on the? Yes. In fact, Your Honor, EPA is also conducting a remedial action at this site for the non- Currently. Yes, currently. And that's for the non-hotspots where you don't have this immediate exposure. And there are some additional hoops. Those are in the National Contingency Plan. There has to be a baseline risk assessment, remedial investigation, and feasibility study. Those are a lot more detailed. And EPA is doing that here just as far as the timing of the remedial action. EPA expects late, in late fall or early winter, to issue its baseline risk assessment and so-called RIFS. Don't forget to answer Judge Fletcher's question. What additional hoops would you have had to jump through? Yes, I'm sorry, Your Honor. I thought I did address that. You said a baseline risk assessment. Yes, a baseline risk assessment, a remedial investigation. Investigation, right. A feasibility study. Those are the main ones, and those are laid out in the National Contingency Plan. Well, you would have had to also prepare a feasibility study with a detailed analysis and allow for a notice and comment period, right? That's correct, Your Honor. There's more. In which your proposed solutions could draw alternative solutions from the person probably ultimately to pay for. There is a more detailed public comment process. So instead of digging up, say, 10 feet down of dirt, they might have said dig one foot and then pave the rest or put some tarpaulins over it or put some liquids that hold asbestos in the ground. They would have had a chance to come up with alternative solutions. Two responses to that. One, there is a more detailed public comment process. But, two, here, Grace had every opportunity to participate. They submitted detailed, very detailed comments and documents, and EPA entered those in the administrative record. If you look at our supplemental appendix, you'll see several memos from EPA, several letters from EPA to Grace responding to every single one of those comments. And EPA made that a part of the administrative record. They're very lengthy, very detailed. But Grace did have an opportunity here, a full opportunity. Let me ask you, as a practical matter, if you accurately characterize this as a removal action, or the EPA accurately characterized it as a removal action, but then it turns out in the process of the removal action you undertake some other activities, such as replacing the trees or the popcorn machine or whatever the case may be, do you agree that for activities that aren't properly removal activities, that those should be disaggregated in terms of costs? Yes, Your Honor. But I might add, Grace never asked the district court to disaggregate in that fashion. They took an all-or-nothing approach below. In fact, if you look at their summary judgment briefs, I don't think you'll see a mention of the popcorn machine or any of the specific examples they're giving now. They took an all-or-nothing. They didn't ask for a disallowance of particular costs for particular actions here. Now, those were taken as removal action. And obviously a contaminated popcorn machine you don't want students using. And EPA determined it was less costly to just replace it rather than try to clean it. So that's what they did. What about the fact that the district court didn't actually provide a legal definition of emergency? So we don't know what the district court was benchmarking against. Wouldn't it normally be the case that if we had an absence of a legal standard, that since we don't know what legal standard the district court used, that we would remand on that point? If that was the court's conclusion, you would remand for a determination on the administrative record. And that's right in the circle of judicial review provisions in 113 that this is reviewed on. So if that was your conclusion, I think, yes, a remand would be proper, but for the district court to apply the correct definition on the administrative record. On the administrative record. Okay. Correct. Then when I asked a similar question to Grace, and it might not have been on the disaggregation question, it might have been on whether this should have been characterized as removal or remedial, there was talk about there being a trial in the district court. What issues, in your view, and I know you don't think there should be a trial because you won the summary judgment, so I understand that completely, but what issues are appropriately trial versus on-the-record issues in this kind of a cost recovery action? Yes. First of all, the only trial issue on appeal now is the indirect cost question. Right. Grace did not appeal from any of the other specific costs, ATSDR costs and other matters on trial. But as far as remanding on the emergency question, if that's still what you're getting at here, that is solely on the administrative record. There's no trial issues on that. It's EPA's detailed administrative record and its application in this case. I see my red light. And if the court were to do that, let's just hypothetically, because it is bothering me a little bit just because I thought there would be more on emergency. I thought there would be some other federal definitions we would be looking to. But were we to remand on emergency, would the district court simply be determining whether or not there was an emergency so the cap could be exceeded, or would the district court then be looking at the particular actions that were taken and deciding category by category whether those were emergency actions? I think it's the former, Your Honor. Sort of a winner-take-all proposition. But again, yes. But again, it would be the court would be, assuming this court instructed us to a definition or instructed the district court to come up with a definition of some kind, that would be applied again on EPA's administrative record. And on that record, I assume that then we would look, you would then have to weigh in on the degree of deference that might be owed to the EPA as the authoritative agency. Correct, Your Honor. Once you have the definition, at that point, the application on the administrative record gets you to the arbitrary capricious standard under this Court's decision in Chapman. All right. Thank you. My red light's on. I hope counsel will at least have a few minutes on it. No, we'll give him the time due. Thank you, Your Honor. We took all your time, so we're going to give it back to you. Thank you very much, Your Honor. At least part of it. Part of it. Or at least as much as you need based on the question. May it please the Court, before I go into my part on the indirect costs, there was a lot of discussion of the OSHA PEL issue earlier. And let me just call the Court's attention to EPA's first response to Grace's comments, where Grace actually raised the very question that Your Honors raised about the OSHA PEL. And EPA discussed why it did not believe the OSHA PEL was an appropriate standard for determining household risk, because the OSHA PEL standard is designed to protect workers who are only working an eight-hour day, who have training in asbestos exposure, and who have access to protective equipment and medical care. It's just inapplicable when you're dealing with a family that has near constant exposure in their home and doesn't have the access to the protective equipment or the medical care.  It might be that if you had a .03 fiber burden count, you could make that argument because the eight-hour period is only one third of the day, and therefore you could use 24 hours to get up to .1. But when you're 40 to 30 times away, that's not a good argument. I don't think that's true. Remember, the standard of risk for workers that OSHA has established is 3.4 times 10 to the minus 3. So even in the worker context, OSHA is allowing more deaths per 10,000 people's exposure than EPA would in the household context where it's 1 times 10 to the minus 4th through 1 times 10 to the minus 6th. I'm not concerned with deaths as I am concerned with fiber count. Well, my underlying comment is this is an issue that was addressed to EPA in its administrative process for the removal actions. And so what I'm saying to you today isn't in the record. The appropriate place to go is to the record of the removal actions and look at how EPA responded to grace in this very same criticism. If EPA's response is satisfactory, then they're not arbitrary and capricious on this point. If it's unsatisfactory, then they are. So that's my fundamental point. But it is addressed on page 10 of our supplemental excerpts of record. Now to the cost. Yes. Grace does not dispute that EPA may recover from PRPs the indirect costs associated with the Superfund program. That is, program costs that cannot be attributed to a specific site cleanup. Nor does Grace dispute that indirect costs should be allocated to individual sites based on EPA's relative effort at those sites. We differ in the appropriate way to measure effort for the purposes of that allocation. EPA's indirect costs could be allocated a number of different ways. By the number of sites that EPA handles in a given year, essentially a pro rata allocation of its indirect costs. By labor hours, by labor dollars, or by total site costs, just to name a few possibilities. From an accounting perspective, total direct costs is the best allocation base because it reflects the Superfund program's activities. There is strong support in the record for this proposition. Statement of Federal Financial Accounting Standard Number 4 itself states that total direct costs may be used to allocate indirect costs. To allocate the indirect costs. Pardon? To allocate the indirect costs. Correct. But the point I think that Grace is making is if EPA were running the job, then you could take, and were running all the jobs, you would just say what's the direct cost for running all the jobs, how much overhead do we have a central office allocated based on the direct costs. But that's not what's happening here. EPA is subcontracting out or contracting out the cost to some outfit which already has its overhead figured into its costs. So that EPA, as I understand it, is charging indirect costs on what Ajax Manufacturing charges. Although Ajax Manufacturing already has its indirect costs in there. Even though it's not supervising what Ajax Manufacturing is doing, it's charging the cost as if it were running the job. Right. I think that's the issue as I understand it. Right. And there's two answers to that, Your Honor. The first is that there's no overlap between the indirect costs that EPA is incurring at a site through its efforts and the overhead costs that its on-the-ground cleanup contractor is incurring. EPA's indirect costs are related to the general overhead for EPA's overall activities in supervising site cleanups, the big picture work on the site cleanups. But EPA's indirect costs are also related to its regulatory efforts, as Grace used the term. The regulatory efforts are the overall costs of running the Superfund program that can't be attributable to specific sites, things like developing cleanup standards, data quality procedures, policy guidance, contract administration. The list is fairly extensive. And these are the policies and procedures that govern the Superfund cleanups, regardless of who's doing the work, regardless of whether it's the contractor or EPA. So on the other hand, the contractor's indirect rates are basically the costs that support the contractor's cleanup staff, you know, the lights of their offices and so forth. So there's not the overlap between what the contractor is doing and what EPA is doing. The second answer, in addition to the fact that there's no overlap, is just imagine what would happen if EPA tomorrow said, you know, there's nothing unusual about the EPA's use of cleanup contractors at Libby. In fact, EPA uses cleanup contractors at all of its sites. It's just determined that outsourcing the on-the-ground cleanup is the cheaper way for it to go. But if EPA tomorrow decided not to hire any contractors, that would eliminate the contractor direct costs and the contractor's overhead costs. But EPA would still have to get the cleanup done. So EPA would have to go out and hire more truck drivers, more sampling technicians, more cleanup technicians, more people to supervise that on-the-ground work, and that would take people. So EPA would end up hiring many more people for its own staff. Those people would have, they'd take vacation time, they'd have sick time, they'd have computers. We understand that, counsel. Now, the Department of Transportation had the responsibility for a lot of this. Is that correct? That's correct. They were basically EPA's general contractor at the site. Does that make a difference when we've got another government agency with all of its? So are you saying that EPA has oversight over the Department of Transportation? That's exactly right. EPA was making the overall cleanup decisions at the site, and the Department of Transportation was implementing them. And there's conceptually no difference between EPA using the Department of Transportation as a cleanup contractor and using Bechtel as a cleanup contractor. It's whoever EPA had hired to be its general counsel at the site would have had indirect, would have had its own indirect cost expenses that would have been tacked on. That's just, EPA is essentially buying a cleanup, and part of buying that on-the-ground cleanup work is paying the indirect costs of its contractors. So back to my original point, as the, if EPA weren't hiring contractors, it would have more employees. Those employees would have computers. They'd need office space when they weren't out in the field. They'd have, some of them would have secretaries. All of that would add up to a larger indirect cost burden. So whereas EPA might avoid it by not using contractors, when they actually have to go out and do the cleanup work, those indirect costs build right back up. So there is no, from an accounting perspective, there's no difference between whether EPA does the cleanups itself  Does the current method, is it allowed under this Regulation 4 or this Rule 4? Yes, the current method is certainly, in fact, total direct costs is specifically mentioned in Standard 4. Now, we don't dispute that, as I said, there are many different ways you could allocate your indirect cost pool to, and labor costs is one way to do it. But we think that in light of the facts here, the particular nature of EPA's operation, that's just not the appropriate standard to use. And there's lots of support for that in the record. The General Accounting Office and KPMG both examined EPA's methodology before it was issued and both found that total direct costs is an appropriate allocation base for Superfund indirect costs and an improvement over the labor hours base. Okay. I think we have your point. Unless there's other questions, we'll give two minutes rebuttal to Grace. Thank you for your argument. Thank you, Your Honor. Would you respond briefly to the claim that you didn't seek to have anything disaggregated before the district court? Absolutely, Your Honor. They came in and they sought to have the entire thing blessed. Our point, we came forth with specific evidence and our genuine issues of material fact challenging that point. So, and it seems to me that's still the issue before you now, is did the district court validly grant summary judgment as to the whole thing in gross? For the disaggregation, we're simply suggesting as a remedial mechanism at this point, given that you all, to the extent you all say the district court was wrong in putting a stamp of approval on the whole thing in gross, we would concede that they can try and come forward to try and justify individual things. But they're the ones who forced the issue as the aggregate thing in gross. They're the ones who came into the district court and says, please bless this. The district court just put the stamp of approval on the whole thing. So because of the district court's reasoning where he said all EPA had to do was consider these factors, in a sense it's two ships passing in the night from this discussion that we've just been having here, where the government is saying that there is, that basically all their facts should be taken at face value, their science issues as well as their characterization as an emergency. And our basic point is we've never had our day in court on that issue because the district court granted summary judgment merely by saying that the government considered the relevant factors. And we produced material evidence. We've got the Bartelt report and the Anderson report, both dealing with the science that, as Judge Bea brought up, and with the emergency point, Judge McKeown, that you brought up, that was going to be what the bench trial was going to be about, whether or not those things were justified. Again, it seems to me if once you say that the district court was incorrect as a legal matter in saying mere consideration of the relevant factors is sufficient as a matter of law, then you really have to have the contested back and forth. That's the way our process works, Your Honor. What you're saying is that besides consideration, there should be something called a finding. Correct, Your Honor. Exactly. But that's what you say, though, to the government's response that under the procedures here and under the statute that it's on the record. Well, Your Honor, absolutely. We're prepared on the record. There's the administrative record. The existing administrative record. And Section 113J also allows for supplemental materials such as is typical in administrative law. It specifically says that. And the district court allowed us discovery on a number of things. And so we have materials both in the administrative record and supplemental materials as specifically authorized by the statute, which is the discovery that the district court allowed. We've got depositions of Perinard, who was the lawyer and the office coordinator. Right. Did the district court consider the first deposition of Mr. Perinard? Well, Your Honor, the district court granted summary judgment before the deposition of Mr. Perinard had been completed. Okay. And then allowed us to take another day of deposition. We'd only taken one day of deposition at that point and allowed us to file a motion to reconsider, which was denied, because, again, if you take the legal standard that the district court applied, that mere consideration is enough, that was really what drove the analysis. And there was no consideration going down more at the level that we've just been discussing here. Thank you. Your time is up, unless we have more questions. I have one more question. In the district court's order on the summary judgment, he recites certain things that both sides agreed upon. So he said, as to $30 million, we really don't have any dispute, so then we're going to try it as to the rest. Exactly what did you agree to or concede? Your Honor, that was in his second summary or his second order, which is his cost order. In other words, that he first granted summary judgment. At that point, it really became an accounting issue. And at that point, we didn't dispute from an accounting point of view $30 million, but that's not to say that we hadn't already objected and preserved our objections on the removal remedial ground, in other words, whether they were entitled to those costs in the first instance. Once he crossed that bridge in his first summary judgment ruling, there was no further issue regarding the government's accounting to be held to be an issue for the second phase, for the trial. So he limited it that way. But certainly, with respect to all of the EPA's costs, we vigorously objected. And in the record at ER 1095, you'll see our disputed issues of material fact, where we really go through the issues, both with respect to the science and with respect to how they treated it as or how they did not treat it as an emergency. Thank you. The case of United States v. W.R. Grace is now submitted. I want to thank all counsel for your arguments. We know you've been at this for a number of years, a lot longer than we have in terms of the record, but we appreciate the arguments. They were very helpful. We are now adjourned for the morning.
judges: B. Fletcher, McKeown, Bea